We have two cases scheduled for argument this morning. The first case is Hyatt v. Iancu, 18-2390. Mr. Krause, are you ready? You reserved five minutes of your time for rebuttal, correct? Yes, I am. Thank you, Your Honor, and may it please the Court. The applicant here, Mr. Hyatt, has engaged in a pattern of unreasonable delay in prosecuting claims before the Patent Office. That unreasonable delay includes an extreme delay in presenting the claims in each of the applications here, in all four of them considered together, and across 400 similarly situated applications. It also includes uncooperative and obstructive conduct during the patent examination in these cases, as well as three specific examples of what I would call egregious misconduct across the cases. The first of those examples is his tendency to put the identical or patently indistinct claims in different applications. Let's go directly to the doctrine of prosecution latches. What must be shown in order for that to apply? An unreasonable and unexplained delay in, among other things, presentation of claims to the Patent Office. There are two Supreme Court cases that provide the foundation for the doctrine. That's the Woodbridge case and the Webster case, both from the 1920s. In Woodbridge, the delay was nine and a half years. In Webster, eight years. The purpose behind it is twofold. It's once somebody invents something, they're supposed to file a patent for it so the public is aware of the invention. Then that patent term is supposed to begin as soon as possible after the invention so that eventually the patent… In order for the doctrine to apply, does there have to be a violation of a specific regulation or statute? There does not. It's an equitable doctrine that was put in place to essentially police conduct that is within the letter of the statute. We see that in the Lemelson case and we see it in this case, although, as we point out in the brief, Mr. Hyatt did violate some regulations and some laws along the way. In the red brief, Mr. Hyatt says, quote, to inflate the numbers, PTO turned to continuation and part relationships. When PTO asserts that Hyatt possessed his claimed invention 16, 20 or even 28 years before filing his 1995 application, it is referring to the filing dates of continuation and part patents. This is what I'm interested in, which follows. But PTO presented no testimony or evidence that those parents disclosed any invention claimed in the subject applications or that Hyatt even contends so. I wanted you to answer that for me. I believe the contention is in his priority claims themselves. He claims priority, yes, to continuations and part. But he claims priority all the way back to 1970 and some evidence that he's trying to claim subject matter from 1970 is one of these instances of egregious conduct. I mentioned his attempts to claim the microprocessor patent, which he lost in interference in 1995. He's continuing to introduce claims to that subject matter with presumably a priority date. That's record evidence? That's record evidence. The district court specifically found that conduct was not reasonable, but apparently thought it was an isolated instance. But that's the sort of thing that's occurring across these patent applications, even apart from the delay, which alone under Woodbridge and Webster would be enough to find latches. The delays in presentation, whether you look at the earliest priority date as we did, as we think we have to, because he doesn't know. I don't want to interrupt your flow, but I want some answers to assertions that are made in the red brief. The next one is at 32 in footnote 4, which is the whole page is two footnotes, basically. There the government says that without explaining this history to the examiner, Mr. Hyatt reentered his claims and so on. The government then states the USPTO rejected those belatedly filed claims in 2014 on the basis of prosecution latches. Hyatt says, you assert that Hyatt reintroduced claims previously lost in an interference proceeding, and you failed to substantiate the point. And then I was looking at 44 of the blue brief, which I think answers it, but I want you to discuss it. I thought I heard two different fact scenarios in there. There's definitely the microprocessor claim at issue. There's also the conduct relating to the 094 application. Are we asking about the microprocessor? Well, I'm asking about their statement that you assert that they reintroduced claims previously lost in an interference proceeding, and they say you didn't prove it. And I have my answer to that. I want your answer. It's in our blue brief. We responded to that directly in our reply brief also. Page 26, the entire claim, and the claim appears at appendix 39268 to 39270. It is only to an electronic data processing system implemented on a single integrated circuit chip. Okay, and then one last sort of housekeeping kind of question. On page 13 of the yellow brief, you say that Mr. Hyatt's expert reports and slides in 2017 are the very information the USPTO written description rejections were begging for Mr. Hyatt to provide during the administrative proceedings 20 years later. What do you mean they were begging for them? The examiners in each of these cases were frustrated by Mr. Hyatt's refusal to provide written description support for these later added claims. There's an MPP provision, which was in effect at the time, MPP 2163.04, which says that for later added claims, the applicant is supposed to show support in the specification. It only makes sense, especially for these unusual claims that don't find direct support in the specification, to provide that along with the claims. Mr. Hyatt litigated his right not to provide that information, and that culminated in this court's finding in 2007, the Hyatt v. Dudas case, where this court specifically said, yes, it is applicants' responsibility to show written description support for the later added claims, which he did not do. And so that's part of the prosecution misconduct that we're talking about. I'm sorry. It's okay. Has he to date complied with the Hyatt restrictions? In the restriction requirements, he has selected. He's selected the families and the 600 claims under each family now? Yes, and we're rejecting those. However, he is maintaining his right to potentially challenge the restriction requirements. Sure, but he's challenged those multiple times and lost, hasn't he? This court has specifically said the requirement was reasonable. It wasn't in connection with a direct challenge to it. I think he would say he still has the opportunity to challenge it in connection with the prosecutions. In these cases, I will say he is continuing to submit amendments, even for the claims that he didn't select. So he's operating as though all 115,000 claims, 45,000. So can I ask you to just focus me a little bit? I mean, the ultimate question here, the finding that there's no prosecution lashes, we would review for abuse of discretion. But I take it you're arguing that the district court applied the wrong legal framework. Could you be specific about what you think was legal error here? That's correct. There were at least three separate legal errors, I would say. The first one is the district court, although acknowledging that Mr. Hyatt had delayed in presentation of the claims, completely failed to analyze it. The claims here were presented at least 12 years, as much as 28 years from the earliest priority date. Under either of those Supreme Court cases, that should be prosecution latches. Once you have possession of an invention, you should be trying to pound that. I'm sorry. Repeat what the error was. The error was failing to consider the delayed presentation of these claims in the first place. Mr. Hyatt's contention is that he had support for this subject matter as early as 1970 or 1975 or 1983 or 1988. But he's saying he had support for that subject matter, and yet he waited at least 12 years before submitting those claims to the patent office. Is that an error in limiting the scope of time that the district court was looking at? Or was it just not giving that evidence so much weight? I think that's a good point. Because one of them is a legal issue, and one of them sounds like an abusive discretionary error. He didn't address it at all, and I think the way you just put it is accurate. He limited the scope of the time that he would consider to the time period that these claims were an act of prosecution. But that neglects the history of Mr. Hyatt not presenting those to the office. And that's exactly what happened at Woodbridge and Webster. They had claims that they were not presenting to the patent office, or they presented and delayed the issuance for that year. The delay in presentation results in a delay in issuance. So under the Latches Doctrine, you think the district court was required to review the entire period and not just a part of it, not just stages? Yes, he was required to review from the time that Mr. Hyatt first claims to have invented these inventions, the priority date, to the time that he submitted them to the patent office. And then he should also consider what happened at the patent office. Did you argue that there was some sort of delay or unreasonable conduct during that time? During which time? From the time that the application was filed? Yes. So there's an unreasonable delay in presenting the claims to begin with. That's the 12 to 28 years. But then when it gets to prosecuting in the patent office, there are several different kinds of unreasonable conduct. The first of which was when the examiner tried to get... He didn't provide support for the later added claims as required by the NPEP in this court's subsequent case in 2007. And the other thing he did was he continued to add new claims, hundreds of new claims. Each one of these patent applications has several hundred claims in it, 1,592 in total. And I see I'm into my rebuttal time. Can I just ask one more? Sure, go ahead. This is unrelated, but I don't see very many of these 145 cases, and it seems like there's an issue here. This is not necessarily related to latches, but he... And maybe his counsel can explain what he's asking more, but it seems like he's asking if he prevails here, that you all have to issue patents not only on the ones he won on in the trial, but all the ones that were in his complaint that weren't actually litigated, that Judge Lambert didn't look at. And I don't... How does a 145 action work? When you get the two rejections in a board decision and you come to a de novo review, if you only pick, say, five of 15 rejected claims to go in the 145 trial, is the decision of the district court only final on the five? If they're rejected claims, our position is absolutely there are, and that's why... And this court had held that in the Gould v. Quigg, 1987. But I take it what he's arguing is he put all the claims here in his complaint, but the district court only looked at some of them because those were only the subject of the board decision. What's the effect of the district court not looking at those others? Our position is those still need to be evaluated by the agency. There's some where the board reversed rejection, so there aren't actual rejections by the agency. Sure. I get that's your position here. How does it work in the typical 145 case? If somebody brings in to the district court and says, I want a de novo review of these claims, what happens to rejected but not raised claims to the district court? I think this is the only case where it has occurred. 145 actions are relatively rare. Again, I just think applying normal patent principles, they have to come back to the office for further consideration. The district court can certainly rule on the claims that are before it. Okay. Before you sit down, I do have another question. So when we're reviewing the doctrine of latches, applicability of latches here, we're looking at unreasonable conduct, correct? Yeah. So if Mr. Hyatt's conduct is shown to have complied with agency regulations and your procedures, and apparently all submissions have been timely filed, and so their conduct falls within the realm of satisfying and complying with your procedures, then what's unreasonable here if they choose to slow it down? Because, okay, go ahead. Well, number one is the period of time that they failed to do anything, i.e., failed to present these claims to the patent office, exceeds the time held to be prosecution latches by the Supreme Court. That should at least create some kind of presumption of latches. But then the second thing is he violated our procedure when he came to the patent office and failed to provide written description support for later added claims. We only saw that support first in 2014 when he started to make these arguments in connection with one of these district court actions. So there are certain things he certainly has the right to do. We've learned from the Supreme Court that he has the right to introduce written description support much, much later, but that doesn't necessarily mean he complied with reasonable conduct during the patent application process. And in this case, he essentially rendered that entire examination time a nullity by introducing new evidence. Okay, so the government's position that an insufficient submission, legally insufficient submission, unsupported, for example, is inherently untimely? Or are they two different things? You mean unsupported by the written description? I think they're probably two different things. There's a debate. We think the vast majority of the claims he's been submitting are not supported  We only see the tip of the iceberg. In this case, these may be the best case for which there is a written description support case, but even that falls apart because, as you saw, the district court felt a need. But you're not saying they're untimely. You're saying they're timely but invalid. They are untimely in the latches sense, in that he presented them much later. They may be timely in Judge Reyna's sense, in the sense that they were submitted and he timely complied with the timing requirements in the course of examination. But they were certainly untimely, and the fact that he only got around in 2014 to show written description support is another instance of that latches, where he had an obligation to move the prosecution along. Okay. Thank you. Counselor Grossman? Good morning. May I please have the query? My friend began discussing the doctrine of prosecution latches and explaining that it begins to toll when an inventor, in his words, invents something and then proceeds to delay the free use of that particular invention. I think that gets right to the heart of the issue in this case. I have a lot of questions for you. On page 20 of the blue brief, the government says, one of the suits that you took in action, that you took, I'm adding that in, was the litigation underlying the Supreme Court's capitalist decision. Why did you litigate that to the Supreme Court and then fail to act? Ultimately, the case was dismissed for want of prosecution. Mr. Hyatt faults his attorneys for that. I should note, we were not those attorneys. Mr. Hyatt was severely penalized for that. That application was forfeited. I'm going to want pretty succinct answers because I have a lot of questions and you have 20 minutes, 15 minutes even, if we can extend that. On 51 and 52 of the blue brief, the government says the five claims the district court found that the specification described are indistinguishable from the rest of the unsupported 639 claims. How are they distinguishable? I believe these are the cache memory type claims. With respect to each of those different claims, everybody agreed that the specification disclosed cache memory. What was different between the claims was each one concerned the combination of cache memory with other limitations. The limitation with respect to the claim there, it was just a different combination of elements. If you look at the district court decision with respect to the cache memory written description support portions of it, each one of those focused on different combinations than at issue in that claim. On page 15 of the red brief, you say that the district court found that Hyatt could not be faulted for any delay between 2003 and 2012 based on the PTO's stipulation of that effect. How was that a valid analysis by the district court? The PTO repeatedly stipulated that it was not charging that time against Mr. Hyatt because the PTO effectively blocked prosecution of his applications for that decade-long period. But because you were litigating subsidiary issues that might have affected all of those cases and the way it was conducting its examination. There was a lot of back and forth evidence on that. We argued in our findings of fact and conclusions of law based on the testimony that the time periods didn't really line up and that that's not really what was going on. That was before we even put on our case. The PTO asked the district court not to consider any of that. In other words, we made these fact arguments. The PTO said, don't consider those fact arguments. They're irrelevant. We are not citing that time period in support of our laches argument. And so the district court didn't make any factual findings on that point because the PTO said, not relevant to laches. On page 25 of the red brief at footnote 1, you say the 398 application was one of nearly 100 of Hyatt's applications assigned to a single examiner with a full docket of other applications. Do you deny the blue brief's statement of the number of full-time examiners assigned to Hyatt's applications? If I recall correctly, that statement concerns a much later time period. During the time period when this particular application was being examined, there were in fact approximately 100 applications assigned to Brian Werner. And he had a full-time docket of other applications that he worked on during the day. He worked on Mr. Hyatt's applications in his free time in the evenings, just as something he enjoyed doing. That's nice. On page 27 of the red brief, you say that to inflate the number of claims and applications, the PTO turned to continuation in part relationships. What record evidence do you have that shows the PTO was inflating numbers? If you're talking about inflating the time periods at issue here? No. Oh, the number of claims? Yeah. I mean, that is what you're saying. So with respect to continuation in part relationships, I think the thing to focus on, we've got four applications here in this case. They were subject to summary judgment and then trial. There was never a dispute between the parties as to what the applicable priority dates were. And that's typically, and I believe if you go through the prosecution history. Now you asserted, I want succinct answers if I can. You asserted the PTO inflated the number of claims and applications. Oh, I apologize, Your Honor. I misunderstood your question. So I want to know what record evidence you have. We were not able to put on our case, but in evidence there was the prosecution histories of Mr. Hyatt's pending 1995 applications. And the PTO to inflate the number includes, I believe, canceled claims as well as currently pending claims. I'm going to cede to my brother for the moment. I have a lot more. I have a question. I mean, looking at the record and looking at the amount of cases and claims, if Sherlock's home was here, he'd say there's something afoot. Something's going on. And it seems to me that although Mr. Hyatt may have been within the confines of agency regulations and procedures, that there was significant delay, and some of it appears to have been intentional, this failure to cite the specification for an extended period of time. And I don't know if you would say I disagree with you, Judge. There's no delay here. This is not unusual. But I think it's highly unusual. And something's happening, and although you may have been within the scope of the regulations, I think the doctrinal latches would still apply here, and I think our case law would support that. Your Honor. I'd like to know from you, you know, what is it that was reasonable about the behavior, the conduct here that resulted in this maze, this beehive of thousands of claims and specifications that are hundreds of pages long, and without you pointing to what's relevant or not. And so I wanted you to have that opportunity to explain that to me. Thank you, Your Honor. I appreciate that. And, of course, as Your Honors are well aware, Mr. Hyatt did not put on his defense because the district court granted judgment on partial findings. With that being said, Mr. Hyatt's specifications describe entire systems that he invented, which have multiple inventive features, and that's what's claimed in his applications. If you look at the individual claims, the claims tend to be very narrow. These are not broad, cover-the-world claims. They tend to describe particular uses, particular functionalities, and so on, with many limitations. I think that by and large describes why there are so many claims. In terms of the issue of delay, I will note that we're talking about four applications here. Isn't that the problem in the Latchis analysis, that the district court allowed you to focus in on four single applications from this vast universe and then limited the time frame for consideration to a much narrower time frame than the entirety of the conduct here? And the problem the Patent Office has is not just with these four applications. It's with the way, since 1970, that Mr. Hyatt has prosecuted all these applications. And isn't that legal error when he limited the scope of what he was going to review for Latchis? Your Honor, the district court did not limit the scope. I want to be very clear about this. Let's assume I disagree with your reading of that. May I have the opportunity to explain why we believe that's the case? Sure. First of all, the PTO conceded that post-2002 actions, at least 2002 through about 2013, were not going to be chargeable with respect to Latchis. Second, my friend, Mr. Krause, spent a lot of time talking about the presentation of claims. This court said in Symbol that simply that the passage of time or the mere use of continuation applications is not itself Latchis. There has to be something more. This court has a half dozen cases that state that proposition with respect to Latchis. You've got to stop when I start talking. I'm going to let you finish, but you've got to stop. I apologize, Your Honor. Maybe the mere passage of time doesn't mean Latchis, but doesn't when it's 20 or 30 years turn into something that's not just mere passage but unreasonable? First of all, we're not— I know you dispute that, but let's just assume that's a hypothetical, not what happened here. First of all, we're not talking about 20 or 30 years with respect to the presentation of claims. Second, I think it's the government's burden under this court's cases regarding Latchis and prosecution of Latchis specifically to show something more. I will note the prosecution histories of the parent and grandparent applications here, the PTO didn't even offer those in the evidence. They were not before the district court. The PTO didn't have an expert testify that this was unreasonable, this was unreasonable, this should have been done. Mr. Hyatt testified at his deposition that he prosecuted the parent applications to resolve common issues, in other words, issues that might involve multiple claims, and then at that point proceeded to file child applications. This court recognized in Sybil that that was a perfectly legitimate use of continuing applications. My friends did not put in Mr. Hyatt— What about his failure to—when the examiners asked for written description support for these multiple claims on these different specifications, what about his refusal to do that? Mr. Hyatt won many reversals on written description issues before the board. That's not answering my question. He refused, even if he was within his right to refuse, when you have this extraordinary group of patent claims and specifications across all these different things, if the examiner, in order to figure out where there is written description support for a certain claim in a 600-page specification, asks, isn't it unreasonable to not respond? And if you do that multiple times over the course of multiple years, doesn't that at some point end up in prosecution latches? Your Honor, it might, but that's not what happened here. These applications were prosecuted briskly. Mr. Hyatt did put forward written description support, which is why he was able to reverse examiner rejections for lack of written description before the board. These issues were before the board. They were briefed before the board. Mr. Hyatt prevailed on many claims. And then ultimately, the evidence that Mr. Hyatt put forward in court was the kind of evidence that one puts in court, including expert testimony. The PTO has never required that somebody have the testimony of one skilled in the art to present opinion evidence before the agency. That would transform the way that the agency deals with written descriptions altogether. It would make the prosecution process far more burdensome. But at the end of the day, I would still get back to, and I think the court ought to focus on, where Mr. Krause began, which is talking about the individual inventions that are claimed here. Let's get back to the focus of my question. And I asked you as to why the delay here was not unreasonable. I don't think you've answered the question. You did cite simple technologies, and I'm going to read to you one sentence out of there. Thus, in simple technologies, we held that a patent may be rendered unenforceable if it was obtained after an unreasonable and unexplained delay in prosecution. There were delays here. This is highly unusual. The delays here compared to the normal course of the life of a patent going through an application process, this is highly unusual. And I would like to know why it's not unreasonable. Well, again, noting that we did not put on our defense, what I would say was I think the district court properly looked at the different periods of time at issue. I mean, let's just go through the three periods of time, and I think we can address them quite quickly. The first one is with respect to presentation of claims from when the first comments were made. So your argument is that there was no delay? Our argument is that the PTO did not prove that there was unreasonable and unexplained delay here, which was the PTO's burden as the party asserting a prosecution laches defense. The PTO put on basically no evidence with respect to the prosecution of the parent or grandparent applications, no expert testimony, nothing. They simply had the dates, and that's it. And the court's cases make clear that gets you nowhere. Second, the period of prosecution of these applications. The PTO's own witnesses testified that the amount of time they spent in prosecution was unremarkable. The PTO itself in its appellate brief, in its opening brief, devotes all of one page of argumentation to the prosecution of these four applications. That is it. I think you can draw a conclusion from that. And indeed, the PTO's expert was unable to say that anything Mr. Hite did or didn't do during the prosecution of these applications caused any particular period of delay. And as I said, in any instance, they were prosecuted in a reasonable period of time themselves. Finally, you have the period from 2002 to 2012 or 2013. Can I just ask you one separate question? We also have the written description decisions on appeal. If we vacate and remand until the district court to relook at prosecution latches, do we need to look at written description now, or can that wait until after the district court's decision on prosecution latches? I know you want us to look at it now, but can it wait, or do we somehow procedurally err if we wait? I think it would be at the court's discretion. Having 40 seconds left, I would continue the point. I have a lot more questions for you, and I mean a lot more. On page 34 of an 89-page red brief, you say, Hite takes great umbrage with and disputes the lawfulness of the PTO's recent efforts to disparage him in office actions and to push his applications into abandonment. Why do you need that kind of language in an 89-page brief? You know, that's a lot of reading for us to do. I read everything three times. It appears to me that you're writing for your client and not for the court, and, you know, you're an attorney. Explain it to me. I apologize, Your Honor, if that was taken. Our intent was to make the court aware. It was taken as puerile, that is, childish excess verbiage. On pages 36 and 37 of the red brief, you state that for the PTO to now reverse itself, disputing that it stipulated anything, and argue that Hite was really to blame for the agency's delay is stunning. The PTO at footnote 4 of the blue brief says, The PTO offered to stipulate that this period of time does not constitute part of the unreasonable delay, but no stipulation was ultimately entered. And I'm keeping in mind that the government says in a footnote where they say they offered to stipulate that they do not argue that the period in which the PTO stayed in examination from 2003 until 2012 constitutes part of Hite's unreasonable delay. But I want to know, because I didn't see it, where's the stipulation? Your Honor, we cite in the portion that Your Honor quoted to the PTO, the findings of fact and conclusions of law that the PTO filed, which states that the PTO stipulated to that effect. They say they stipulate. Yes. All right. I'll look. On page 39 of the red brief, you say that this court has never upheld a finding of prosecution lashes based on anything other than egregious abuse of continuations that delays the prosecution of specific inventions. I think my brethren have asked this question. How is Hite's full pattern of behavior before the PTO not an egregious abuse of its procedures? Your Honor, Mr. Hite began as an independent inventor, writing and prosecuting his own applications. He did so in a methodical fashion. He obtained 70 patents. He's renowned for his inventions, which were groundbreaking at the time. And he's tried to do the best he can with an agency that, frankly, he has found to be very recalcitrant. I know there are recriminations on both sides as to the conduct of the parties. And I will simply note that those issues, that set of issues, is being litigated now in the Eastern District of Virginia, where we overcame the PTO's motion to dismiss on a claim that the PTO has a de facto policy to simply preclude Mr. Hite from obtaining further patent applications, and that it's had that policy in force from approximately the late 1990s. How does that answer my question? That it's not an egregious abuse of procedures? Has the court there held that? I'm sorry. I'm confused. Your Honor, my point is that I think if you look at some of what's happened here in a vacuum, you can say there's been a lot of time that's passed, and that seems awfully unusual, and we don't disagree with that. Okay. But the question— No. You know the rules. As I said, I want to keep this succinct because I have a lot of questions. On page 43 of the red brief, you say that the government's argument at pages 36 and 37 of the blue brief, quote, relies entirely on the bare number of claims without any analysis of their substance, the subject matter they concern, their relationships or structure, the nature of the inventions at issue, or even how they compare to other applicants' claims. Do you agree that on page 36 of the blue brief the government provides a chart, a big chart, showing the distribution of claim counts for your applications and analyzing the individual claim counts over time? I assume that chart appears there, Your Honor. I should think you'd know the briefs. Yes, Your Honor. There is a chart. Okay. How are those detailed statistics not analyzing the substance of the claims? Your Honor, this Court has said, with respect to, say, undue multiplicity, that too many claims is not really any type of argument under the Patent Act. You have to look at the individual claims themselves, and you have to determine whether they're meaningfully distinct and whether they help to clarify the invention. That's the point, which is if the PTO is going to argue too many claims, that simply is not an objection to issuance that the Patent Act recognizes. Do you agree? Well, let me say this. On page 64 of the red brief, you say, the U.S. PTO takes Hyatt's statements out of context by mixing them with unattributed quotes from Castleman equating those terms to GUI. Where are the unattributed quotes? You know, when you say that, I write a marginal note saying. I believe, Your Honor, they're in the section of the PTO's brief that's referenced regarding the definition of the term windows and icons and menus. There are quotes from Mr. Hyatt's testimony that describe his understanding of those particular claims, and there are other quotes in that section that are actually quotes from Mr. Castleman, if I recall correctly, who is the PTO's expert, I would add. I understand, but I didn't find anything that wasn't cited. I'll go back and look again. Your Honor, to be perfectly clear, there were appendix citations there. In our view, it appeared to be somewhat ambiguous as to who was saying what, and we simply sought to point that out. All right. Okay, that's your take on unattributed. On page 78 of the red brief, you say that the U.S. PTO cannot prevail in its challenge to the court's de novo factual findings on Claim 214 because it introduced no evidence to rebut Hyatt's new evidence. But on page 42 of the yellow brief, the government says you don't dispute the district court's conclusion that the specifications discussion of buffer memory and frame memory was not sufficient to support similar claims reciting cache memory. Do you dispute the district court's conclusion? Not with respect to... There was an issue whether buffered memory, whether the term buffered memory was sufficient to encompass cache memory, and the district court held against us on that description issue. But that was not an issue in Claim 214. Claim 214, the issue there was the combination of cache memory with a computer and refreshable memory, and we put on specific evidence of that, and the PTO's expert declined to offer an opinion on that issue. On page 6 of the yellow brief, the government says, well, references Hyatt v. Boone, the TI case. Is it true that TI owned the computer on a single chip invention in 1971? They did prevail on the interference action regarding that, yes, Your Honor. On page 18 of the yellow brief, the government says the agency has to know about these identical sets of claims to examine them consistently, and the claims in two of the applications at issue were patently indistinct and identical. How are they patently distinct? The particular claims at issue? I'm not sure to which claims the government was referring in that instance. I will note that the government did not raise any double patenting issue in this particular case, and it could have under this Court's decision in Troy v. Sansom, and in fact it did raise a ground of rejection as a defense with respect to Lachey's. On page 27 of the yellow brief, I'm trying to move you along because I have a lot. The government states that while Mr. Hyatt asserts on page 1 of the red brief that the US PTO routinely disparaged him and his applications in court filings and to Congress, going so far as to announce that it would never allow any of them to issue, Mr. Hyatt cites no evidence to support those allegations. Where is that evidence in the record? Your Honor, we would be happy to file a notice of supplemental authority that cites those particular... That wasn't my question, was it? Come on now. I asked you where is that evidence in the record? I have some volumes here. I can try to lift the others. It's a big record. Where is it in the record? I don't want supplemental authority on 14 volumes. Your Honor, I do not recall whether that's in the record. I would have to present that in a notice of supplemental authority, which as I said, we're happy to do. On page 37 of the yellow brief at footnote 14, the government says that contrary to Mr. Hyatt's statement that cancer research addressed Bogies and held that intervening right is required for any application of prosecution latches, cancer research did not overturn Bogies in any respect. Why do you believe it did? We do not believe it overturned Bogies. If you look at cancer research technology's discussion of Bogies, it made clear that intervening rights was proven before the board. The PTO did in fact prove that, and the board ruled against the applicant on that issue, and the applicant did not raise that issue in his appeal to this court. Okay, one last question for you. I don't know what others have. On page 56 of the yellow brief, the government says that you, quote, cite your own proposed findings of fact, and they give a JA sign, in support of your claimed video image sources. I ask counsel this a lot in various cases. How are your own proposed findings of fact the basis for a citation? Two points, Your Honor. First of all, in several instances we did cite our findings of fact, where those findings of fact compiled pieces of testimony that it was useful to have in one place, and so it was simply for the sake of convenience where we quoted the actual testimony at issue. And I think in many of those instances, perhaps not all of them, we parenthetically cited the portion of the testimony that was at issue. Second, with respect to the video, there was video evidence presented at the trial, but the district court ultimately did not rely on that. No, this is video image sources. It's not... Oh. Yeah. Oh, it's video image sources.  Okay, then I'll check the record and see if it's right. Mr. Grossman, we thank you for your answers. Thank you. Let's hear from Mr. Krauss now, and I'm going to restore your time to five minutes, sir. Thank you, Your Honor. Can I start with just my side question? If we decide to vacate and remand on latches, is there any need for us to wait in the written description right now? Subject to checking, there may be, in one of these cases, I think in the 211 case, the only thing that remains alive are these written description rejections. In other words, if you uphold our position on written description, that application... No, no, no, no, no. If we send this back to the district court and say, look at the latches defense again, isn't your position that that takes care of this whole case? It absolutely does. So why would we need to wait into written description now? I think it is a matter of this court's discretion, and it is a matter of economy, especially if you provide an opinion that provides clear instructions to the district court on how to deal with the latches question. Maybe we can avoid the written description questions entirely. But we would ask that based on this record, the court simply agree with us that prosecution latches applies and write a decision to that effect. We don't see anything that Mr. Hyatt could possibly say in his rebuttal case that would overcome the unreasonable delays that occurred in presenting claims here. Well, that seems highly irregular. I mean, he wasn't even allowed to put on a full defense, and he may still ultimately prevail, but if he wasn't allowed to put on a full defense, he should be given that opportunity. It's an unusual case, and it warrants an unusual request, but I completely understand that you might think that there's a reason to remand, but again... When the government says we don't see what he could possibly say, it doesn't mean that he doesn't see what he could possibly say. Well, again, the delays here happened even before, you know, there's latches occurred even before he presented the claims to the agency, at the agency, despite the fact that he just said these were normal prosecution times. They were not normal prosecutions because we emerged from prosecution from the examiner with no sense of where the written description support was. But his counsel suggests that they have good reasons for that, and they weren't allowed to present them. Whether they do or not is a different story, but it seems to me that if we ruled for you without giving him that opportunity, our judgment would be very infirm if he sought further... All we would ask is that you lay out the law of prosecution latches as clearly as possible for the district court to apply on remand. And in doing so, are we asking the district court to review the application of latches in the same manner it did before by taking out certain time frames and certain familial applications, or is not the actual test one a totality of circumstances? Totality of the circumstances is the actual, you know, overall test, and that's one of the errors that district court committed by not considering these applications in the context of the other 400 applications at issue. But there are also some guidelines you could provide as far as how long is a reasonable amount of time to wait before presenting claims, what constitutes reasonable conduct. I'm not so sure we could do that as much as we could say how long is not a reasonable amount of time. That's another way of formulating it, and I think that would be acceptable as well. I will just back up. On the prosecution time, opposing counsel did say it was a normal prosecution time. Again, it was not a normal prosecution. He mentioned that they prevailed at the board, and that should somehow be evidence, but that was only based on the fact that he was at the board and presented new evidence entirely at the board and new arguments. An example of that is A214 of the record where the board notes the examiner, noting that this is the very first time Mr. Hyatt offered written description support for a certain claim. And even then, the board in these cases, mostly on the reversals, went off on its own without a whole lot of help from Mr. Hyatt to reverse written description rejections by the examiner, some of which were just on procedural grounds. Mr. Grossman mentioned the grandparent applications. We failed to talk about that. That wasn't a focus of our case, but part of our case we did mention the 094 application, which is a grandparent to the 211 and 398 applications. Here in that application, he received an allowance back in 1988 on certain claims and then didn't take the claims, allowed them to go abandoned, which in itself wouldn't necessarily be wrong, or let's say not taking the claims wouldn't be itself wrong because he might want to present new prior art. But then he allowed the claims to go abandoned only to reintroduce them 10 years later, adding a 10-year delay to these previously allowed claims. So that's the discussion of the grandparent applications. I think if we do look at the grandparent applications, we'll find that they don't justify the conduct that has occurred in these. The problem is he keeps on adding claims and duplicative claims across the applications. I will also briefly mention the so-called stipulation by the government. We are not trying to count those, that 10-year period from 2003 to 2004, against Mr. Hyatt. We don't need to. We have up until 2003 worth of delay. That's over 30 years with respect to some of these patents. But we do believe the conduct during that period underscores that there's something more going on here than trying to get claims. In other words, the conduct was all to vindicate his right not to present information, not to engage the agency in a normal prosecution process. And it all confirms, in fact, he did not. Because in the Supreme Court case, he was actually asking for the ability to introduce evidence relating to written description that he had withheld from the patent office. Do you have any questions? If there's nothing else. No, we thank you very much, Your Honor. Mr. Krause. Your Honor, we have a rebuttal regarding our cross-appeal. But before I turn to that, I would simply follow up on two questions from Judge Wallach. The language regarding the stipulation is... Why don't you just address the cross-appeal? Yes, Your Honor. So, with respect to our cross-appeal, the issue is whether Section 145 applies to claims on which the board reversed all rejections. We think that whatever the court decides on laches or the other issues, it would be useful to reach the cross-appeal issue and decide it as well, so that the district court, should there be a remand, knows what to do on that remand. The district court held that it lacked Article III jurisdiction over those claims. The PTO does not defend that view on appeal. There is, as we cited in our brief, Supreme Court precedent, that the prospect of further administrative proceedings, the prospect of a remand, creates a sufficient Article III injury to satisfy the Constitution's case or controversy requirement. So, if we agree with you... I find this procedure unusual, because we don't see it very often. If we agree with you that there was Article III jurisdiction on those claims that the district court didn't address, isn't the remedy to tell the district court he has to address all of them, and your arguments on all of them, not to order them granted? No, Your Honor. I think it depends on exactly what... Why? He refused to address them, so there's no decision on them. The Patent Office can't lose by default when he refused to specifically address them. Your Honor, I think this might be the unusual case  Let me explain why. The Supreme Court held in Kappos v. Hyatt that the ordinary Federal Rules of Civil Procedure govern Section 145 proceedings. When a party does not raise any defense to a claim, that party defaults on the claim. That's simply the way the Federal Rules work. The statute is quite clear that those claims were properly before the district court. The district court, though. If the district court thought he had authority to hear them, and if the Patent Office failed to provide a defense, that might be one thing. The district court clearly said, I can't hear these cases because of a... I don't know whether he was correct or not. It seems to me like he operates in the District of Columbia and he's used to exhaustion of administrative remedies, and that may be what he was looking at. Frankly, I thought that was probably right, too, until I looked at this. But since it's a de novo action, if he has improperly failed to address these claims, I don't see how his decision can be seen as a judgment on the merits at all. It's an error, and then the decision is he has to look at them, and the Patent Office has to provide a response. Well, Your Honor, two points, if I may. First of all, the PTO did actually provide a defense to those claims. It asserted prosecution laches as a defense to those claims in its amended answer in each of these cases. So it did assert one defense. Well, isn't that even more problematic for you because they have not waived their right. They asserted a defense. He refused to hear that defense altogether with regards to those cases or those claims because he said he didn't have jurisdiction to hear them. Your Honor, that happened at the end of the case. The PTO never attempted to obtain judgment on those claims. The district court did not decide that it lacked Article III jurisdiction over them until the very end of this case because they were addressed in the party's conclusions. I don't know how that helps you. I mean, I don't know how you can argue that it's somehow a default judgment when the district court's judgment explicitly doesn't cover them. The error, you may be right that there was an error there, but it seems that the remedy would be to tell the district court that he has to consider however many other 100 claims you want to present to the district court. Your Honor, if I may, Your Honor, if this were a case not involving the government, if it were just regular parties and civil litigation. Well, I mean, that argument is not going to get you very far. But I'm just saying that I think everyone would agree that that ship has sailed at this point. I mean, a party has to offer its defenses in its answer. At this point, you know, those answers have been out there for years. And the party has to seek judgment or seek to challenge a claim. And in this case, the PTO simply never did that. That's just under the normal federal rules of civil procedure. The PTO adopted a litigation strategy. My guess is that the PTO's response is going to be, and probably correctly so, that you can't default the government. I am not aware that that is a rule, Your Honor. I mean, the government may not defend itself with respect to every claim in every case. The ordinary rules of civil procedure apply. If the court has no further questions, thank you. We thank you very much for your arguments.